**Electronically Filed
Intermediate Court of Appeals
CAAP-13-0003039
19-APR-2017
09:00 AM**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---


STATE OF HAWAI'I, Plaintiff-Appellee, v.
VICENTE KOTEKAPIKA HILARIO, Defendant-Appellant


NO. CAAP-13-0003039


APPEAL FROM THE CIRCUIT COURT OF THE FIFTH CIRCUIT
(CR. NO. 11-1-0023)


APRIL 19, 2017


FUJISE, PRESIDING JUDGE, LEONARD AND GINOZA, JJ.


OPINION OF THE COURT BY FUJISE, J.

I.

Defendant-Appellant Vicente Kotekapika Hilario
(Hilario) appeals from the July 25, 2013 Judgment of Conviction
and Sentence for Murder in the First Degree in violation of
Hawaii Revised Statutes (HRS) § 707-701(1)(c) (Supp. 2016) and
Bribery of a Witness in violation of HRS § 710-1070(1) (2014)
entered by the Circuit Court of the Fifth Circuit (Circuit
Court)[1].

---

[1]     The Honorable Randal G.B. Valenciano presided.

    The jury also found Hilario guilty of Retaliating Against a
Witness and Intimidating a Witness.  These counts were merged with his
conviction for Murder in the First Degree for purposes of sentencing.

We consider two points of error raised by Hilario.[2] Hilario argues that the Circuit Court (1) erred in denying his Motion for New Trial, based on his claim the Circuit Court denied his "right to meaningfully participate in trial based [on] the trial court's process of conducting extensive individual juror questioning at the bench and the denial or impairment of his right [to] peremptory challenges" and (2) deprived him of a fair trial by admitting evidence related to the so-called "Safeway Robbery."

## II.

### A.

This case stems from the December 17, 2010 shooting of Aureo Moore (Moore) near the Anahola Beach Park on Kauai. Moore was the complaining witness in a robbery that took place on August 21, 2010, in the parking lot of the Safeway supermarket in Kapaʻa (Safeway Robbery). Kyle Akau (Akau), Hilario's friend, was accused of the Safeway Robbery and it was said that Hilario was the driver.[3] On August 24, 2010, three days after the Safeway Robbery, police arrested Akau and Hilario[4] for the Safeway Robbery. Initially, Hilario was driving and Akau was his passenger. However, Akau had tried to flee on foot and after a short search of the area, police found Akau and recovered a backpack in Akau's vicinity in which a camping permit, timecards, a paycheck stub, and Aston Hotel receipts bearing Hilario's name were found. The backpack also contained a loaded Jennings .22

---

[2]     This case is before us on remand from the Hawaiʻi Supreme Court, which decided the Circuit Court properly denied Hilario's Motion to Dismiss based on an alleged violation of Hawaiʻi Rules of Penal Procedure (HRPP) Rule 48. See State v. Hilario, SCWC-13-0003039, 2016 WL 4272904 (Aug. 12, 2016) (mem.).

[3]     At trial in the instant case, Hilario admitted that on August 21, 2010, Akau was a passenger in his car when he took another friend to Safeway. Hilario testified that, while they were in the parking lot, Moore, whom Hilario knew of but had not met, walked up to them and stuck his head into the car. When Hilario told Moore to leave, he did, and shortly thereafter, Akau left the car. Akau met up with Hilario again after Hilario dropped off the friend. As he and Akau were heading towards Hanalei, Hilario saw Moore in the Safeway parking lot with police.

[4]     The parties stipulated that Hilario was arrested on August 24, 2010 and subsequently charged with Robbery in the First Degree and Accomplice to Robbery in the First Degree for the Safeway Robbery, but on September 13, 2010, his charges were dismissed without prejudice.

caliber pistol and additional ammunition, a loaded Colt single-action Army .45 caliber pistol, 125 Oxycodone pills, and a dealership key tag for a gray 2006 Nissan Altima.

Angienora "Pua" Crawford (Crawford) testified that she was addicted to OxyContin and oxycodone pills and that she knew Moore as a user and a supplier and Hilario as one of her suppliers. On August 21, 2010, between the Kapa'a Safeway and Foodland supermarkets, she saw a male[5] yelling at Moore, "Where is it at? Where is it at?" and understood that Moore was being robbed. Because she was angry with Moore at that time, saw no weapon, and did not think Moore would be hurt, she walked on by. However, when she got to the end of the walkway, she heard a gunshot and realized the seriousness of the situation. Shortly thereafter, the police arrived and Crawford gave a statement to the police.

Crawford also testified that in September through October 2010, Hilario asked Crawford several times, in exchange for pills or money, to testify that the person she saw robbing Moore was not actually the robber.[6] From her discussions with Hilario, Crawford understood that Hilario wanted to help out this guy because "was his family." Hilario told Crawford that he was not at the robbery. Hilario also expressed concern that although the charges against him had been dismissed, he was concerned that they could be brought again. However, she understood that Hilario was more concerned about the person who was facing trial for the Safeway Robbery. Ultimately, Crawford was never asked to testify about the Safeway Robbery, and she never gave Hilario an answer to his requests.

Crawford testified that, at some point in October or November, Hilario's requests changed from testifying to arranging

---

[5]    Crawford testified that she had never seen the male before that day, but had been close enough to be able to identify the male "at that time."

[6]    Hilario denied telling Crawford to change her testimony regarding the Safeway Robbery as he said Crawford told him she did not see anything, had not heard gunshots, and had not seen "this guy" Kyle Akau. Hilario also denied offering Crawford money or pills for her testimony.

a meeting between himself and Moore.[7]  Hilario made ten or more of these requests.  Crawford testified that she thought the requests odd because Hilario could set up a meeting with Moore himself.  However, Hilario did not want Moore to know about setting up a meeting.  Crawford did not refuse but put Hilario off.

On the day before the shooting, Hilario called Crawford, asking her if she wanted more pills, and whether she could bring Moore to "the ABC Store."  Crawford told Hilario, "no," they had pills.

The following day, December 17, 2010, Moore called Crawford to ask if she knew anyone who had pills.  Knowing that Hilario had pills, she called Hilario, thinking that she could be the "middle man" in the transaction and be able to benefit as a result.  At the time, Crawford knew that Moore did not want to meet with Hilario and that Hilario wanted to see Moore, "but not in a nice way."  She thought that there would be a talk and perhaps a fight.  Ultimately, Crawford agreed to bring Moore to the lookout at Anahola because it was a little more out in the open, there was a lifeguard station there, and it was frequented by campers.

Crawford then called Moore to tell him she was coming; she did not tell Moore she was driving him to meet Hilario.  Crawford picked Moore up and dropped him off at the Anahola lookout, where Moore gave her $100 for six pills, and she drove off to meet Hilario nearby.

When Crawford met Hilario, Hilario was wearing a white t-shirt with a dark design or picture on the front and black cargo shorts and was driving a dark-colored Nissan.  Hilario gave Crawford five oxycodone pills and refused her money, saying, "No,

---

[7]     Hilario admitted that he asked Crawford to set up a meeting between he and Moore.  He testified this was because he wanted to find out what motivated Moore to bring false charges against him.  He denied pressuring Crawford for the meeting and testified that, although he knew where Moore "hung out," it was where drug transactions were conducted and drugs were being used, and that he could not "talk to someone about that stuff in that environment."

that's for you." Hilario then told her, "When you leave, just go out the other direction, and if anybody asks, you never saw me."[8]

Crawford followed his instructions and saw that Hilario drove in the opposite direction, towards where she left Moore. While Crawford was driving around Anahola town, she heard sirens and saw emergency vehicles racing by. Later that day, Crawford heard through word-of-mouth that there had been a shooting in Anahola. She did not go to the police until two days later, after she heard the police were looking for her, and did not tell the police about her involvement with a drug transaction or that Hilario had given her pills on that day.

Manaku testified under an immunity agreement that he was a childhood friend of Hilario and was a close friend of both Hilario and Joseph Kainoa Hansen-Loo (Kainoa). Manaku also testified that he helped Hilario collect drug money owed to Hilario. Kyler is Kainoa's younger brother.

Manaku testified that, on December 17, 2010, Hilario, Kyler and Manaku planned to go fishing. Manaku and Kyler were clad only in surf shorts and Hilario was wearing a white t-shirt, surf shorts, black hoodie and slippers.[9] In December 2010, Manaku was about six feet one-inch tall and weighed 300 pounds. On the way to Anahola Beach Park, Hilario stopped at a "pull off" with a big pine tree and told Manaku and Kyler to get out of the car and go over the guardrail. As they did so, Hilario drove off.

While sitting on the other side of the guardrail, Manaku heard a loud vehicle drive up and saw a Caucasian male get out of the vehicle and sit near the pine tree. Shortly

---

[8] Hilario had a slightly different take on the events. He agreed that he ultimately told Crawford that the $100 was "for you," but explained that was because he did not have any change to give her. He also testified that he was concerned about keeping David Kawika Kawaihalau-Manaku (Manaku) and Jens Kyler Hansen-Loo (Kyler) waiting, so he told her, "Just keep it. You figure out whatever you guys got to figure out with [Moore] or whatever, and I'll just talk to you about it later." Hilario denied telling Crawford "you never saw me," but did admit he told her, when Crawford mentioned that Moore "thinks it's you we're meeting," "You don't have to tell him."

[9] Hilario testified that he was wearing a white shirt and surf shorts; Manaku wore a green polo shirt, a hoodie jacket, surf shorts inside of black shorts, and a beanie.

thereafter, Hilario walked up from behind them,[10] now wearing a beanie/ski mask that he then pulled down over his face, stepped over the guardrail with Manaku and Kyler following, and fired two shots in the direction of the Caucasian. The Caucasian yelled, got up and took two steps before two more shots were fired and the man fell to the ground. Hilario walked up to the man and fired two more shots at the back of the man's head. Manaku, Kyler, and Hilario all ran away from the scene.

At one point while they were running, Manaku lost sight of Hilario for ten to twenty seconds, after which Hilario reappeared without the hoodie. Manaku testified that he saw Hilario wrapping up something in what looked like the beanie and throwing it in the water in the "three rocks" area of the beach. A Raven Arms Model P-25 .25 caliber semi-automatic handgun was recovered from the water in this area on December 20, 2010.

Kyler's testimony was broadly consistent with Manaku's, but differed as to the critical facts. He testified that he was six feet or six feet one-inch tall and at trial weighed about 180 pounds. He also agreed that, at the time of the offense, he was taller than Manaku and Hilario. Kyler testified that on December 17, 2010, it was Manaku that wore a black jacket and a beanie, and after Hilario dropped them off at the pull-off and another vehicle left a male, it was Manaku that pulled the beanie over his face, shot the male six times, and threw the gun and beanie into the ocean as they ran away from the scene. According to Kyler, they met up with Hilario close to their fishing spot, when Manaku boasted to Hilario that he "aced that guy" and Hilario looked surprised.

Cheryl Corneal (Corneal) testified that she was setting up her pastele stand on Manai Road when two gunshots from up the road drew her attention and she saw two people running in her direction a few feet before the ironwood tree. The men stopped, one leaned over and shot towards the ground twice, and she could see a person's leg move up, making her realize a person had been

---

[10] Hilario testified that he did not go to meet Moore because Crawford told Hilario Moore was "thinking about just dropping it and saying that he doesn't remember anything happening" and Hilario did not want to "stir up any feelings."

shot. The shooter was of medium build, wearing a green or blue plaid shirt with a hoodie, a baseball cap or a long pony tail, and long, dark shorts. The other person was huskier, wearing only dark long shorts. Although she could not see the shooter's face, Corneal knew Hilario and the shooter matched Hilario's general height and weight.

On December 17, 2010, Rusty Kaimipono Brewer Ah Loo (Ah Loo) was standing at the bottom of the hill on Anahola Road adjusting his iPod when he saw two men come out of the bushes near the ironwood tree. Ah Loo testified that he saw one person come out from behind the tree and shoot the other as the latter was running and fell forward, then when the person was on the ground, more shots were fired aimed at the back and head area. Ah Loo heard a total of five shots. Ah Loo described the shooter as "skinny and tall" and wearing a ski mask, a long-sleeved shirt, long pants, and shoes.

Kaimakana Wedemeyer (Wedemeyer) was on duty as a lifeguard on Anahola Beach on December 17, 2010. He testified that he heard five shots, began to scan with his binoculars and saw that the "pastele lady" looked "really alarmed." As he continued to scan up the road, he saw two individuals running up the road; one was a shirtless male, the other looked like a male wearing a green and black hoodie which covered his head. The shirtless individual was facing the other and had his hands raised, as if to say, "what are you doing?" The person with the hoodie had his hands down, as if they were in his pockets. It appeared as if the two were arguing as they ran. Wedemeyer drove his truck up Manai Road and could still see the two individuals running further up the road; when he reached the ironwood tree he saw a male face down and realized the male was a gunshot victim.

On December 17, 2010, Brehden Kamibayashi and Austin Kekoa Alfiler were driving away from the "Crack 14" area of Anahola beach, when they saw three men running; the three men slowed to a walk as they drove by. They next encountered police, who told them the police were looking for people who were running; they told the police what they had seen. When they subsequently were shown a photo lineup by the police, they

7

identified the first of the three as Kyler and the last of the three as Manaku, but could not identify the second person, who was wearing a dark hoodie and looked away from them.

Hilario maintained that as he was driven past where Moore was supposed to be and where he dropped off Manaku and Kyler, he saw "somebody laying there," a couple of trucks parked, and people standing around. He told his driver to continue driving and asked to be dropped off at the dead end of a road in a nearby housing development. From that point, he walked on a path towards the fishing spot at which he expected Manaku and Kyler to be waiting, but met them as they jogged down to meet him. Hilario testified that Manaku admitted to shooting Moore multiple times.

## B.

Prior to the trial, the Circuit Court ruled that it would admit an audio recording of Moore's preliminary hearing testimony (Moore's Testimony) regarding the Safeway Robbery. Moore's Testimony was determined to be relevant to the instant case because Moore was murdered ten days before trial for the Safeway Robbery was scheduled to begin, and Hilario was aware of the content of Moore's Testimony because Hilario was present at the preliminary hearing.

The audio tape of Moore's Testimony was played for the jury. The jury was instructed that information in Moore's Testimony could not be used to conclude that Hilario was of bad character and therefore more likely to have committed the charged crimes. Moore's Testimony included statements that he saw Hilario drive to the Safeway parking lot, where Akau exited Hilario's vehicle. Several days after Moore's Testimony was played for the jury, the Circuit Court ruled that it would allow evidence of the contents of the backpack found with Akau when he was arrested on August 24, 2010, three days after the August 21, 2010 Safeway Robbery. However, the Circuit Court decided that only evidence connecting Hilario to the Safeway Robbery, and thereby relevant to motive, opportunity, intent, and preparation

with regard to the instant offenses under Hawai'i Rules of Evidence (HRE) Rule 404(b), would be admitted.

On March 8, 2013, Hilario was convicted of Murder in the First Degree (Count 1), Retaliating against a Witness (Count 3), Intimidating a Witness (Count 4), and Bribery of a Witness (Count 5).

On May 2, 2013, the Circuit Court heard three motions: (1) for a new trial, (2) for judgment of acquittal, and (3) to strike the motion for judgment of acquittal. The Circuit Court denied all three motions.

This appeal followed.

## III.

### A.

***The Circuit Court Erred in Excluding Hilario from All Voir Dire Sidebars.***

Hilario moved for a new trial on the basis that he was denied his right to be present under HRPP Rule 43 when he was excluded from sidebars[11] conducted to examine veniremembers during jury selection.

> As a general matter, the granting or denial of a motion for new trial is within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion. . . . The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant.

State v. Yamada, 108 Hawai'i 474, 478, 122 P.3d 254, 258 (2005) (quoting State v. Kim, 103 Hawai'i 285, 290, 81 P.3d 1200, 1205 (2003)).

The interpretation of a court rule is reviewed de novo, Sierra Club v. Dep't of Transp., 120 Hawai'i 181, 197, 202 P.3d 1226, 1242 (2009), and "[w]hen interpreting rules promulgated by the court, principles of statutory construction apply." Gap v.

---

[11] "1. A discussion among the judge and counsel. usu. over an evidentiary objection, outside the jury's hearing. -- Also termed *bench conference*. 2. A discussion, esp. during voir dire, between the judge and a juror or prospective juror. -- Often shortened to *sidebar*." Black's Law Dictionary, 1592 (10th ed. 2014) (defining "sidebar conference")

Puna Geothermal Venture, 106 Hawai'i 325, 331, 104 P.3d 912, 918 (2004) (citation and internal quotation marks omitted).

> Statutory construction is guided by the following rules:
>
>> First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. And fifth, in construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning.
>
> Carlisle v. One (1) Boat, 119 Hawai'i 245, 256, 195 P.3d 1177, 1188 (2008) (quoting In re Contested Case Hearing on Water Use Permit Application, 116 Hawai'i 481, 489-90, 174 P.3d 320, 328-29 (2007)) (block quotation format altered).

State v. Woodfall, 120 Hawai'i 387, 391, 206 P.3d 841, 845 (2009).

The rule at issue here, HRPP Rule 43(a), reads the same today as it did during Hilario's trial:

> **(a) Presence Required.** The defendant shall be present at the arraignment, at the time of the plea, at evidentiary pretrial hearings, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this Rule.

The Hawai'i Supreme Court has long recognized that HRPP Rule 43[12] codifies the presence requirement of the Confrontation and Due Process clauses of both the United States and Hawai'i Constitutions. State v. Okumura, 58 Haw. 425, 427, 570 P.2d 848, 851 (1977). The HRPP is modeled after the Federal Rules of Criminal Procedure (FRCP) and FRCP Rule 43, as well as cases interpreting its language, are instructive in considering questions presented under HRPP Rule 43. State v. Samuel, 74 Haw. 141, 155, 838 P.2d 1374, 1381 (1992) (considering federal cases applying FRCP Rule 43 to jury instruction settlement

---

[12] The Hawaii Rules of Criminal Procedure were replaced with the HRPP in 1977. HRPP Rule 43 has been substantially amended since, but not in ways that affect our analysis here.

conferences). FRCP Rule 43's scope is broader than the reach of
constitutional provisions protecting the right to be present as
it also incorporated the "more expansive common law understanding
of the right." United States v. Reyes, 764 F.3d 1184, 1189 (9th
Cir. 2014) and United States v. Washington, 705 F.2d 489, 497
(D.C. Cir. 1983).[13]

With this backdrop, we turn to an examination of the
procedure employed by the Circuit Court here. As the Circuit
Court explained to the first venire at the beginning of the
selection process,

> I'm going to bring you here, and most of our discussion will
> occur at the bench outside the presence of the other jury
> panel members. What that means is there's going to be some
> delay, because we're going to have you walk from where you
> are seated to the bench. And then when you're done, we're
> going to have you walk back. Part of the reason I like to
> conduct jury selection at the bench is because much of the
> information that you will be giving the Court might be
> personal, personal to you.
>
> And while the attorneys need to know that
> information,[14] there is probably zero reason why the other
> jury panels [sic] need to hear your personal information.
> And so, what I'm going to do is I'm going to try and do my
> best to protect your private information. There's an
> inconvenience or delay because you're going to walk back and
> forth, and it's going to take additional time. But the
> Court in weighing the need to protect your privacy versus
> some of the inconvenience, I'm leaning towards protecting
> your privacy.

The Circuit Court began by reading a synopsis of the
case and the indictment to the venire and announced that matters
concerning qualification to serve would be discussed first. The

---

[13]     Pertinent to this case, we note that HRPP Rule 43(a), like FRCP
Rule 43(a), requires a defendant's presence "at every stage of the trial
including the impaneling of the jury." To "empanel" means "[t]o swear in (a
jury) to try an issue or case. Also spelled impanel." Black's Law
Dictionary, 638 (10th ed. 2014). As both rules mandate presence "at every
stage of the trial including" empanelment, and consistent with cases applying
FRCP Rule 43, we include jury selection in our analysis under HRPP Rule 43.
See Washington, 705 F.2d at 497, Reyes, 764 F.3d at 1188.

[14]     In its oral ruling denying Hilario's motion for a new trial, the
Circuit Court remarked,

> Now, in regards to bench conferences, I'm not aware of any
> court where whenever there's a bench conference, the
> Defendant comes up to participate in the discussions of the
> bench conference. Because if you're saying that the
> Defendant has to fully participate including coming up for
> bench conferences, I'm not aware of any situation where the
> Defendant walks up and down with the attorney to participate
> fully at the bench conference.

Circuit Court instructed veniremembers to raise their hand, if any of them had an answer they wished to keep private or believed was embarrassing, and they would be allowed to answer at the bench. Although the initial questions pertained to qualifications for service, veniremembers often raised at the bench instead, or in addition, other topics more accurately characterized as exemptions or excuses from service, such as conflicts in their schedules, claims of hardship, or medical conditions. Occasionally, veniremembers also took the opportunity during these sidebars to raise issues that involved potential bias. These matters were taken up at the same sidebar, with court and counsel conducting an examination of the veniremember.

Eventually, in open court, the Circuit Court also asked veniremembers if they had heard or read anything about the case, had religious reasons or any other unwillingness to sit in judgment of a person, were unable to apply the reasonable doubt standard, had prior experience as a witness, knew or had relationships with any of the parties or potential witnesses, or had any contacts with law enforcement, or any other reason they could not be fair and impartial. If jurors raised their hand indicating an issue, a sidebar was then typically held with the juror.

At the bench, the Circuit Court took the lead in questioning but counsel also examined, or were given the opportunity to examine, the veniremember at each of the sidebars. This procedure was followed throughout the remainder of the eleven-day jury selection process, continued during general voir dire, and during further examination as a result of peremptory challenges.

With this understanding of the procedure actually employed, the question becomes whether it was a violation of HRPP Rule 43 to exclude Hilario from these sidebar examinations of veniremembers. We conclude, on these facts, that it was.

The plain language of HRPP Rule 43 supports this conclusion as it requires that the defendant be present "at every stage of the trial including the impaneling of the jury." It is

12

true that Hilario was in the courtroom when these sidebars were held.  However, as his counsel argued before the Circuit Court,

> Hilario has a right to challenge any particular jurors for cause as well as he has a right to exercise his preemptory [sic] challenges.  And a key component to adequately exercising those rights is to be able to hear the [veniremember's] questions and answers, [and] to view [their] demeanor. . . . And he was just not able to do that. . . . . So, without being able to fully assess the demeanor and the answers and the way that they answered, we were denied his right to participate in his trial.

Given the combination of rights the rule was designed to preserve, a defendant's physical presence in the courtroom, without the ability to hear what is said or observe the facial expressions of the persons being examined during these proceedings would frustrate the purpose of the rule.  See Okumura, 58 Haw. at 431, 570 P.2d at 853, quoting Bustamante v. Eyman, 456 F.2d 269, 274 (9th Cir. 1972) ("The right to be present at trial stems in part from the fact that by physical presence the defendant can hear and see the proceedings, can be seen by the jury, and can participate in the presentation of his rights."); Reyes, 764 F.3d at 1194 (ability to see and hear questioning of veniremembers "allows him to observe the prospective jurors' answers and demeanor so that he can assist his attorney in constructing an impartial jury.")

Although Hawai'i courts have not specifically examined the exclusion of defendants from sidebars during jury selection, a number of federal courts have weighed in, ruling that, upon request, FRCP Rule 43 requires defendant's presence at sidebars or in camera examinations.  Reyes, 764 F.3d at 1190, United States v. Cuchet, 197 F.3d 1318, 1319-20 (11th Cir. 1999), United States v. Ford, 88 F.3d 1350, 1369 (4th Cir. 1996), Washington, 705 F.2d at 497, United States v. Alessandrello, 637 F.2d 131, 138 (3rd Cir. 1980) (voir dire of veniremembers held in a separate room in which only attorneys were present).

As a preliminary matter, because the right to be present under FRCP Rule 43 is not absolute, federal courts have required a specific request to be included, or an objection to being excluded, from sidebars; the failure to invoke the right results in a waiver.  See United States v. Gagnon, 470 U.S. 522,

528-29 (1985). Here, Hilario objected to being excluded while screening of the first venire for qualifications was still ongoing.[15]

Here, the potential impact on Hilario's ability to participate in jury selection was substantial. It appears that nine of the twelve jurors who were ultimately selected for service were examined at a sidebar and six of the nine participated in more than one sidebar.[16] These sidebars included examination regarding more than administrative matters, i.e., statutory qualifications, conflicts in scheduling, or claims of hardship due to jury service. See Cohen v. Senkowski, 290 F.3d 485, 489-90 (2nd Cir. 2002) (distinguishing the "administrative

---

[15]    Hilario did not initially voice an objection to this procedure. However, preliminary to the second day of voir dire, during which the examination for qualifications and exemptions or excuses continued, the following exchange occurred:

> MR. SHIGETOMI: Your Honor, in chambers, we've discussed that the procedure the Court is going to follow is the same as it did yesterday; that the Court will screen the individual jurors at the bench.
>
> And today, because we're getting into knowledge of the case, knowledge of witnesses, I had requested that Mr. Hilario be allowed to participate in those conferences. I was told that the Court's not going to allow that. I'm just making my objection at this point on that procedure.
>
> THE COURT: What we'll do, then, Mr. Shigetomi, is prior to you making decisions, we'll allow you to walk over and confer with Mr. Hilario.
>
> MR. SHIGETOMI: That's fine.
>
> THE COURT: Okay.
>
> MR. SHIGETOMI: I still object to the procedure.
>
> THE COURT: Okay. But we'll give you the opportunity to confer with Mr. Hilario regarding any decisions you feel that you need to confer with him.
>
> MR. SHIGETOMI: I understand.

Hilario's objection was made before any of the sidebars with jurors eventually empaneled were had. Cf. Washington, 705 F.2d at 498 (making distinction between sidebars with veniremembers held before or after counsel's objection); Ford, 88 F.3d at 1369 (ruling that a failure to object before the empanelment of the jury waived the right). Given the facts of this case, we deem Hilario's objection to be timely.

[16]    Of those veniremembers who were eventually excused on Hilario's peremptory challenges, eleven of the twelve were examined at sidebars on multiple occasions.

empanelment process" from examination regarding potential bias from pretrial publicity). The subjects discussed at these sidebars included exposure to pretrial publicity, knowledge of or relationships with potential witnesses, prior experience with law enforcement, prior jury service, and other sources of potential bias or inability to follow the court's instructions. While counsel addressed the venire and exercised their peremptory challenges in open court, upon the veniremember's request, further questioning was conducted at the bench without Hilario present. Based on the extent and the nature of this sidebar procedure, which resulted, at a minimum, in half of the empaneled jurors examined on matters of potential bias at sidebars, we cannot say that Hilario's absence from those sidebars did not affect his ability to participate in the jury selection. Therefore, we conclude that the sidebar procedure followed here violated Hilario's right to be present under HRPP Rule 43.[17]

This does not end our inquiry, as violations of HRPP Rule 43 are analyzed under a harmless error standard, where we determine "whether there is a reasonable possibility that the error complained of might have contributed to the conviction." State v. Pauline, 100 Hawai'i 356, 378, 60 P.3d 306, 328 (2002) (citation and internal quotation marks omitted).

We have considered the accommodation provided by the Circuit Court here, allowing Hilario's counsel to consult with

---

[17] The State argues that the right to be present "is subject to limitation, when security is an issue." We agree that security can be a consideration in modifying courtroom procedures. Washington, 705 F.2d at 497 n.4. However, the State does not point to, and we do not find, any indication in the record that the Circuit Court employed this procedure due to safety concerns. Rather, the Circuit Court clearly articulated that the reason for its decision was the privacy of the veniremembers. While we recognize that court security may be a legitimate concern, without findings by the Circuit Court regarding the nature and severity of those concerns in the instant case, we decline the invitation to speculate on whether safety considerations rose to the level justifying the sidebar procedure used here. Even the case that the State relies upon provides that "unless safety is an issue (in which case the judge should clearly state his or her concerns for the record), a defendant should be physically present at sidebar [during voir dire]." State v. W.A., 875 A.2d 882, 892 (N.J. 2005).

him about the substance of the sidebars.[18]  See Reyes, 764 F.3d at 1195 (citing Gagnon, 470 U.S. at 526-27) ("[T]he ease and reliability with which an attorney can relay the details of a side bar exchange to the defendant is one factor that affects whether the defendant's absence might undermine the fundamental fairness of the proceeding.").  However, the number and the length of some of these sidebars make it doubtful at best that counsel's synopsis of the side bar could serve as a functional equivalent of Hilario's presence.[19]

Nor can we say that the evidence presented at trial was overwhelming.  Reyes, 764 F.3d at 1193 (concluding defendant's presence at the single sidebar would not have changed the verdict where the evidence--defendant's confession, eyewitness identification testimony, and video footage of the scene--was overwhelming).  The jury found Hilario guilty of Murder in the First Degree, Retaliating Against a Witness, Intimidating a Witness, and Bribery of a Witness.  Hilario denied all charges and testified that he was elsewhere when Moore was shot.  The two eyewitnesses to the shooting, testified to irreconcilably opposed

---

[18]    The Circuit Court observed in denying Hilario's motion for new trial:

> There is no prohibition stopping the attorneys from consulting with their clients.  Mr. Shigetomi had every opportunity to consult with Mr. Hilario regarding any matter that occurred here at any time.  There was no prohibition stopping Mr. Shigetomi from asking for a break to consult with his client.  All of those opportunities were available. Mr. Shigetomi, as the attorney, has the ability to use his discretion when he believes consultation should occur.  The Court relies on that discretion, and the holding of bench conferences to conduct jury selection and during the course of trial, the Court believes was appropriate.  So that's not an issue.

[19]    We decline the State's suggestion that we opine on the use of technology to provide Hilario with the ability to hear and see what transpired at a sidebar, as it was not employed here.  We note that veniremembers who voiced the need for assistance in hearing the proceedings were provided with headphones.  However, it is not clear that the headphones that were provided could also relay the sound from the bench during sidebars.  We assume that access to the sidebar discussions was somehow blocked from the hearing of other veniremembers as access would have defeated the purpose of the sidebars.

We also note that video recordings of proceedings in this case included sidebars as copies of those recordings have been included in the record before us.  However, it appears that the perspective captured by the camera is from the gallery to the bench and consequently does not reveal the veniremember's face during the sidebars.

versions of the event. The State does not argue on appeal that the evidence was overwhelming. Consequently, we cannot conclude that the error was harmless.[20]

### B.

### *The Circuit Court's Admission of the "Safeway Robbery" Evidence Did Not Violate Hilario's Right to a Fair Trial.*

### 1.

In his second point of error, Hilario challenges the presentation of "the preliminary hearing testimony of Moore and others in Cr. No. [] 10-1-0285" to the jury in this case. In his argument in support, Hilario points to other evidence-- "prescription bottles recovered from Moore, the arrest of Akau, the search of his backpack and the arrest of Hilario and the search of his person" as improperly admitted during trial.[21] Hilario contends this evidence "did not have the tendency to make the existence of any fact or consequence to the determination of the underlying criminal charges more or less probable than it would be without the evidence" and that "[s]uch evidence only served to show bad character of Hilario and his friend [Akau]." We do not agree.

### 2.

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than

---

[20]    In light of this conclusion, we need not address Hilario's argument that the Circuit Court erred in denying his challenges to certain veniremembers for cause.

[21]    Challenge to this evidence was not included in Hilario's points on appeal and we could therefore disregard it. Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4). While Hilario provides record citations--in his statement of the case--for his objection and the court's ruling, because he does not include a quotation of "the full substance of the evidence admitted[,]" we cannot say with certainty precisely what evidence he challenges. Id. Counsel is cautioned that future violations may result in sanctions.

In any event, based on the lack of specificity in the description of the evidence challenged, we presume Hilario refers to testimony establishing the fact of the arrests and the items he names in his argument that were recovered from the backpack seized with Akau. He does not specify what evidence he challenges arising out of the search of his person upon his arrest. Therefore, we decline to address it.

it would be without the evidence." HRE Rule 401. Hilario was charged, not only with Moore's murder as a witness against Hilario, but with retaliating against Moore for that testimony, intimidating Moore to influence future testimony, and bribing Crawford to influence her testimony or to induce her not to give testimony in a future proceeding. Evidence of "other crimes, wrongs, or acts" is admissible to prove, among other things, motive, intent, or knowledge. HRE Rule 404(b).[22] We review the trial court's determination of relevance de novo. State v. Richie, 88 Hawai'i 19, 36-37, 960 P.2d 1227, 1244-45 (1998).

First, in the audio tape of Moore's Testimony, Moore identified both Hilario and Akau, who were present in court, described Hilario and Akau's involvement in the Safeway Robbery, including Hilario's presence in the driver's seat of a "smoky gray" Nissan in which Akau was a passenger while in the Safeway parking lot, and Akau's use and threatened use of a .22 handgun to coerce Moore's surrender of money and Akau's physical taking of Moore's prescription medications from Moore's pocket. This evidence was relevant to establishing that Moore was a witness in a criminal proceeding, and that Hilario knew Moore was a witness against him and Akau. Moore's Testimony regarding the facts underlying the Safeway Robbery charge was also relevant to establishing the seriousness of the crime and extent of Hilario and Akau's involvement, which in turn supported the strength and

---

[22] HRE 404(b) provides,

> Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this subsection shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the date, location, and general nature of any such evidence it intends to introduce at trial.

The Rule 404 Commentary states, "The specific items listed in the rule as possible relevant facts justifying admissibility are illustrative of the various situations in which common law courts have admitted this kind of evidence."

existence of a motive and intent to commit the offenses charged in this case. State v. Renon, 73 Haw. 23, 36-37, 828 P.2d 1266, 1272-73 (1992) (evidence of motive "is admissible to prove the state of mind that prompts a person to act in a particular way; an incentive for certain volitional activity." (citation and internal quotation marks omitted)).

In addition, evidence of Hilario and Akau's arrests along with the contents of the backpack recovered during Akau's arrest, are similarly relevant to the intent and motive for the charged offenses here. The arrests of Akau and Hilario, as they came three days after the Safeway Robbery and involved Hilario driving what appeared to be the same vehicle used as transport to the Safeway Robbery, supported what Moore himself could not directly testify to, that Hilario was the driver for the pair's activities. More important was the testimony describing what was recovered when Akau was arrested: a backpack containing the possible weapon used in the Safeway Robbery, pills of the same kind taken from Moore, and items bearing Hilario's name, tying him to the gun and drugs, and therefore the robbery. Again, this evidence was relevant to Hilario's motive and intent to commit the murder, intimidation, and retaliation against Moore.

Thus, we agree with the Circuit Court that this evidence was relevant.

3.

As the Commentary to HRE Rule 404(b) observes, "[w]hen offered for the specified purposes other than mere character and propensity, however, 'other crimes, wrongs, or acts' evidence may be admissible provided the Rule 403 test is met." Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." In weighing the probative value of the evidence against the possible prejudicial effect, we consider

the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility.

State v. Behrendt, 124 Hawai'i 90, 106, 237 P.3d 1156, 1172 (2010) (citation omitted). The HRE Rule 403 balancing is reviewed for an abuse of discretion. Richie, 88 Hawai'i at 37, 960 P.2d at 1245.

Here, the evidence of Hilario and Akau's involvement in the Safeway Robbery was strong. The complaining witness, Moore, had seen both men and could identify them and the possible fruits of and weapon used in the crime were found with the men three days later. Crawford saw the Safeway Robbery and knew Moore well, so could identify him and corroborate part of his testimony. Although four months elapsed between the Safeway Robbery and the shooting in this case, Crawford testified that during that interval Hilario contacted her on numerous occasions to set up a "meeting" with Moore. There was great need for this evidence as it provided the motive and evidence of intent for the instant offenses. There was no alternate proof, as Moore was dead and while Crawford testified that she saw the Safeway Robbery being committed, she did not know who Akau was and could not testify to what was said between Moore and Akau or whether the crime had been completed.

Finally, the evidence would not have "roused the jury to overmastering hostility" as they were well aware that the Safeway Robbery was alleged to have been the reason for the charged offenses. In addition, limiting instructions were given before the jury heard the audiotape of Moore's Testimony and before the testimony of each of the two arresting officers was given. The jury was instructed that information in Moore's Testimony could not be used to conclude that Hilario was of bad character and therefore more likely to have committed the crimes he was charged for in the instant case. It is presumed that the jury will follow the court's instructions. State v. Acker, 133 Hawai'i 253, 278, 327 P.3d 931, 956 (2014) (limiting instructions regarding use of defendant's convictions "dissipated the risk of

prejudice to [defendant] because a jury is presumed to follow the instructions it is given by the court.")

## IV.

Based on the foregoing, we vacate the July 25, 2013 Judgment of Conviction and Sentence entered by the Circuit Court of the Fifth Circuit and remand this case for proceedings consistent with this Opinion.